THE STATE (JOHN H. TIMS et al., Prosecutors,) *vs.* THE MAYOR AND COMMON COUNCIL OF NEWARK.

THE STATE (WILLIAM ASHLEY et al., Prosecutors,) *vs.* THE SAME.

1. Where the charter of a municipal coporation confers the power to make assessments for public improvements, the proceedings of the corporation in making such assessments may be reviewed by this court on *certiorari.*

2. If the charter of a city require that the resolutions and ordinances passed by common council shall, before taking effect, be presented to the mayor for his approval, and be approved by him, or, if vetoed, have a second passage, notwithstanding his objections, or that on his failure to return them within five days, they shall become operative, a literal compliance with the charter is essential to the validity of the proceedings; and the resolutions and ordinances should be formally presented to the mayor, or, in case of his disability, to the person performing the duties of the office, by the proper officer, at the time and in the manner prescribed by the charter.

3. The presence of the mayor during the deliberations of common council, and an examination by him of the clerk's minutes, by which he is informed of the passage of certain resolutions, is not such a presentation to him of the original resolutions as the charter requires.

4. Whether the mayor's signature and approval to the copies recorded in the minutes, is sufficient evidence of the presentation of the original resolutions, and a sufficient approval of them. *Query.*

5. If an assessment is made by a municipal corporation, a notice thereof should be given to those upon whom it is made, to enable them to be heard in opposition to or in review of such assessment.

6. Where commissioners, appointed for that purpose, are required to assess upon property the cost of constructing a sewer, "in proportion, as nearly as may be, to the advantage each owner shall be deemed to acquire," the repor' of the commissioners should show that the assessment is made in such pr. portion. A report stating that an assessment was made upon the owners benefited, but not in what proportion, will not sustain the assessment.

7. If the charter of a city requires that persons appointed commissioners must be disinterested freeholders of the said city, it must appear on the face of the proceedings that the commissioners appointed possessed these qualifications. The rule applies not only to those originally appointed, but to those substituted or afterwards appointed to fill vacancies.

---

Two writs of *certiorari* were sued out, to bring before this court, for review, assessments ordered by the common council of the city of Newark for the construction of two sewers, one called the north and the other the south sewer.

The charter of said city authorizes the mayor and common council to construct sewers, and to assess the cost thereof upon property benefited, "in proportion, as nearly as may be, to the advantage each owner shall be deemed to acquire."

Under this provision of the charter, the common council

ordered two sewers to be constructed, and appointed commissioners to make assessments upon property benefited, for the purpose of paying the cost thereof.

The commissioners made the assessments, and reported the same to common council.

The assessment for the north sewer was made upon nine hundred different parcels of property, and fifty-two of the owners thereof are named as prosecutors in the *certiorari.*

For the south sewer, the assessment was made upon two thousand seven hundred parcels of property, and fifty-three of the owners thereof are named as prosecutors in the writ.

Both cases turning upon the same points, they were argued and considered together.

Argued, November term, 1855, before Justices OGDEN, VREDENBURGH and RYERSON; *A. Whit ; a ; and W. P. nnington,* for plaintiffs; *F. T. Frelinghuysen* and *Bradley,* for defendants.

RYERSON, J. These *certioraris* bring up certain proceedings had in the city of Newark, in the construction of two sewers, one called the north, and the other the south sewer. The prosecutors are some of the individuals who have been assessed for benefits, the assessments to be applied to the expense of construction. The total cost of the north sewer was $41,169.33, of which $27,616.22 was assessed upon owners of real estate, on the ground of their property being benefited by the sewer, and the balance, $13,553.11, was assessed by general tax upon the whole city. The assessment for benefits was upon 900 different parcels of property, and of the owners thereof, fifty-two are named as prosecutors in the *certiorari.*

In the other case, total cost $65,311.76, assessed for benefits $44,364.10, and upon the whole city $20,947.66;

2700 parcels of property assessed, and fifty-three prosecutors named.

As nearly all the conclusions to which I have come apply to both cases, they will be considered together.

The writs are directed to " the mayor and common council of the city of Newark," and each commands them to certify and send up "all and singular the resolutions, record, and proceedings touching and concerning the laying out, making, and construction of said sewer, and touching and concerning the assessments aforesaid for paying the costs and expenses of laying out, making, and constructing said sewer; and also the assessments aforesaid, and the proceedings of the common council for the collection of the same."

The prosecutors complain that, by means of these proceedings, they have been illegally assessed, and seek to be relieved therefrom.

In the matter of the north sewer, it appears, by the return to the writ, that on the 1st of July, 1853, the common council of Newark passed a resolution directing the construction of a portion of what is called the north sewer, and that, in pursuance of the resolution, a contract was entered into, and this portion constructed; that, on the 7th of October, 1853, the common council passed resolutions directing the construction of another portion, and that, in pursuance thereof, a contract was entered into, and this portion constructed; that, on the 10th of November, 1854, the street commissioner submitted a report, verified by his affidavit, showing the total expense of this sewer to be $41,169.33, and that on the same day, the common council passed a resolution appointing five commissioners to assess the expense, in whole or in part, upon owners of property benefited, and if they assessed only part upon owners, then to assess the balance upon the city; that, on the 6th of April, 1855, one of the commissioners resigned, and the vacancy was filled on the same

day ; that on the 4th of May, 1855, another commissioner resigned, and the vacancy was filled on the same day. It further appears that, on the 17th of May, 1855, a report was submitted to the council, signed by the two substituted commissioners and two of those first appointed, reporting that they had assessed $27,616.22 upon the owners of property benefited, giving the names and the amounts assessed upon each, and the balance, being $13,-553.11, upon the mayor and common council of the city of Newark, and that on the same day the common council passed a resolution ratifying and confirming the report of the commissioners, and directing the city treasurer to proceed and collect from the parties the sums assessed upon them. It is also certified by the return, that notice to pay was served upon all the parties assessed who could, upon reasonably inquiry, be found. A copy of the notice is returned, dated May 22d, 1855, and requiring the persons assessed to pay their respective assessments to the treasurer by the 2d of July, 1855.

In the matter of the south sewer, it appears, by the return to the writ, that, on the 9th of July, 1852, the common council passed a resolution appointing a committee to report a system of sewers ; that, on the 6th of August, 1852, they submitted a report recommending the construction of a part of the south sewer, which report was adopted by the council on the same day, and a resolution passed authorizing the construction ; that afterwards a contract was entered into, in pursuance of this resolution, and the work commenced about the 1st of October, 1852 ; that, on the 14th of June, 1853, a resolution was passed authorizing the committee on sewers and drainage to make such alteration in the route and grade of the sewer as they might deem necessary, but in such a manner as not to vitiate the subsisting contract. It further appears that the committee caused the line of the sewer to be changed, (the change is set forth, but need not be stated

here;) that, on the 2d of June, 1854, the same committee submitted a report in favor of extending the sewer; and that, on the same day, resolutions were passed adopting this report, and authorizing the committee to proceed with the construction of this extension, and that a contract was entered into, and the sewer constructed accordingly; that, on the 10th of November, 1854, the street commissioner submitted a report, verified by his affidavit, showing the expense of a part of the sewer to be $4896.61, and that on the 1st of December, 1854, he submitted another report, verified by his affidavit, showing the expense of the residue to be $60,415.15, making the total expense $65,311.76, and that on the same day the common council passed a resolution appointing five commissioners to assess, &c., in the same manner as in the case of the north sewer.

It further appears that, on the 6th of July, 1855, a report was submitted to the council, signed by these five commissioners, reporting that they had assessed $44,364.10 upon the owners of property benefited, giving the names and the amounts assessed upon each, and the balance, being $20,947.66, upon the mayor and common council of the city of Newark; and that, on the same day, the council passed a resolution ratifying and confirming the report of the commissioners, and directing the city treasurer to collect, as in the other case; and that a similar notice to pay was served in a similar manner as in that case, the notice being dated July 19, 1855, and requiring payment by the 15th of September, then next. This statement comprises all the material facts appearing by the return to these writs.

In addition depositions were taken, in pursuance of a rule of this court, and so far as is material their contents will be stated hereafter.

One of the defendants' counsel questioned the power of the court to review these proceednigs upon *certiorari*,

on the ground that they were legislative acts. I have no doubt of the power of the court, the practice is too well settled to be questioned.

Some of the proceedings are clearly of a judicial character, whatever may be said of others : of this character are the assessments for benefits, and their confirmation by the common council. This clearly gives jurisdiction, and the court may examine into the legality of such as are of a judicial character, and may also examine whether the previous proceedings, upon which these rest for support, are or not void : if void, the subsequent proceedings dependant upon them cannot be sustained ; if not void, still the others may, for other causes, be illegal, if for either cause any person has been illegally assessed, he may come to this court for relief.

It is unnecessary to review the numerous cases upon this point, and will suffice to cite a few leading ones, which refer to many others. *The State, Durant, prosecutor,* v. *The Mayor, &c., of Jersey City,* decided by this court June term, 1855, *ante page* 309 ; *The State, Mann, prosecutor,* v. *The Mayor, &c., of Jersey City,* decided by this court, February term, 1855, 4 *Zab.*; *The People* v. *the Mayor, &c., of Brooklyn,* 9 *Barb.* 535 ; *The People, &c.,* v. *The Mayor, &c., of New York,* 5 *Barb.* 43 ; *Elmendorf et al.* v. *New York,* 25 *Wend.* 693 ; *Le Roy et al.* v. *New York,* 20 *J. R.* 430 ; *Parks* v. *Boston,* 8 *Pick.* 218.

Two cases in 2 *Hill,* pages 9 and 14, were the ones relied on in support of this objection. In the last case, the question is thoroughly discussed by Justice Cowen, and he admits, on page 25, that the assessment was a judicial act. On page 20, he says " a *certiorari* to reverse a mere corporate act is without precedent, though if it should be altogether destitute of authority, and followed by a judicial decision, which would therefore be void for want of jurisdiction, the corporate act might be examinable on *certiorari,* as incidentally vitiating the latter, for it is too late, perhaps, to deny that there are some judicial acts of

municipal corporations, or rather acts of certain officers of those institutions, which may, in the discretion of the court, be reviewed by *certiorari*." Even this case sustains the jurisdiction in the present instance. Of the many reasons relied on to set aside these assessments, only two will be considered, either of them being sufficient.

*First.* It is objected that the resolutions of the council were never presented to the mayor for his approval, as required by the charter, and were never approved by him, and therefore were void *ab initio*.

By the 22d section of a supplement to the charter, approved March 13th, 1851, it is enacted, "that every resolution of the common council shall be presented to the mayor, or, in case of the death, absence, or disability of the mayor, to the person on whom the duties of mayor shall for the time being devolve, by the clerk of the common council, on the day next succeeding that of the meeting of the common council at which the same was passed ; and if he approve of it, the same shall be signed by him, and if not, he shall return the same, with his objections, to be filed with the clerk, within five days thereafter ; and the said common council may, at its next meeting, proceed to reconsider the resolution so returned, and if a majority of all the members of the board shall then agree to pass the same, it shall take effect ; but in every such case the votes shall be taken by ayes and noes, and entered in the journal ; and if such resolution shall not be returned within five days as aforesaid, it shall take effect in like manner as if he had signed it."

The objection arising under this section is not technical, but substantial and fundamental. For wise purposes, the legislature confided to the mayor this qualified negative, and occasions may often arise when the public interests will require him to exercise the power. A compliance with this provision of the charter is as essential to the validity of a resolution as its passage by the common council.

It does not appear, by the return to these *certioraris*, that any of these resolutions was ever approved by the mayor, or ever presented to him for approval; all that appears is, that they were passed by the common council; what became of them after their passage, does not in any manner appear by the return. The writs commanded the defendants to certify and send up "all and singular the resolutions, record, and proceedings" touching and concerning the sewers; the presentation to the mayor, and his approval, or a second passage, nothwithstanding his objections or his failure to return them within five days after presentation, were an essential part of the proceedings, as necessary to the validity of the resolutions as the passage of them by the common council. When such was the command of the writs, and such the returns, it might well be doubted whether, in the absence of any other evidence on the subject, the court could treat the resolutions as binding, the presumption being that the defendants made a full return, as commanded. Such certainly would be the presumption as against them. In the case of *Durant* v. *Jersey City*, before cited, the mayor's approval of the ordinance appeared by the record.

In this case there is other evidence by the clerk of the common council, and if it be admitted that the legality of the proceedings, if not apparent on their face, may be shown in some other way, this evidence does not relieve the difficulty. It appears, by his testimony, that in the book of minutes containing a record of the proceedings of the common council there is written, at the end of the proceedings of the meeting of June 14th, 1853, at which was passed the resolution of that date, above referred to, as authorizing an alteration of the south sewer, the following approval, signed by the mayor:

"I approve the resolutions of council, passed as above at the last foregoing meeting—Newark, June 15, 1853.

James M. Quimby, Mayor."

It also appears that the resolution of June 2, 1854, authorizing the construction of a portion of the south sewer, was approved in the same manner, but that there was no written approval by the mayor of any of the other resolutions or proceedings.    The witness says that there is no record or other evidence in his office of the approval of the mayor in writing, other than what is contained in the minutes or proceedings of the council, and they show an approval only in the two instances stated.

. At the end of the proceedings of the meetings at which the other resolutions were adopted, similar clauses of approval are written, with blank spaces left for the signature of the mayor, but they were never signed.

On his cross-examination, this witness says, that it was always the understanding that the proceedings of the common council were approved by the mayor, if he did not return them in five days with his objections; that neither the mayor nor any one else had considered it important that he should sign the proceedings of the common council; that the two mayors in office at the passage of these resolutions were perfectly aware at the time of everything done in relation to the sewers, and approved of them; that neither ever sent in any veto to either of the resolutions.

This evidence is not sufficient to show such an approval as the law requires.    If approved, it should have been in writing, in order that the validity of such important proceedings might not be left to depend upon the uncertainty of parol evidence.    Most mischievous results might follow from the adoption of a contrary rule; large powers are intrusted to these municipal corporations, powers liable to abuse, and often greatly abused, and stringent rules should be applied to their proceedings.

In answer to the objection of non-approval, it was insisted that these resolutions were regularly presented to the mayor for approval, and that in such case his approval

was perfectly inmaterial, unless within five days after presentation he returned them with his objections, which was never done.

Was there then any such presentation as the charter required ? The only evidence is that of the city clerk ; and, in addition to what has already been stated, I will state the substance of all that bears upon this point. He says, on his principal examination by the plaintiffs, " the practice of the mayor was to attend the meetings of council, to examine the original resolutions in those cases where he doubted about approving them, and if he vetoed them, to leave a veto message with the clerk ; and, where he was not conversant with the proceedings of the council, to examine the records in the office of the city clerk." To the question, " Have you been in the habit of presenting the resolutions passed by the common council to the mayor, otherwise than by his calling at your office to look over the minutes," he answered, " only in such cases as he desired to see the original resolutions in the meetings of common council when he was present."

On his cross-examination, he said, " that the mayor habitually attended the meetings of common council, and was in the habit of calling in his (the clerk's) office the day after the meetings of the council, where the minutes were open for his inspection ;" " that his habit was to come to the clerk's desk, and examine the original resolutions, and get such an understanding of them as he needed," by which I understand coming to the desk during the deliberations of the council.

Being re-examined for plaintiffs, he said, " the mayor attended the meetings to witness the proceedings, had a chair appropriated to him, but took no part in the proceedings, and invariably called the next day at the clerk's office, but never looked over the minutes, except for some matter that passed after he had left the council chamber."

This evidence makes out no such presentation as the

charter requires, neither in letter nor in spirit, and it is quite surprising that such a practice has grown up. It seems to have been considered that if the mayor was present during the deliberations of the council, and thereby acquired a knowledge of the proceedings, this was such a presentation as the charter required.

Suppose a similar question to arise about the presentation of an act of the legislature to the governor, who would seriously argue that proof of his habit of being present in each house during its deliberations, and thus ascertaining what they did, would be sufficient evidence of presentation? The bare statement of the case is sufficient; it furnishes its own answer. Unless presented, how could he, in case of disapproval, return it with his objections?

The difficulty is not in the least obviated by his habit of calling the next day at the office, as testified to by the clerk. There is no certain evidence that he ever saw any of the original resolutions, nor the record in the minutes of any but two. As to the record of the others, the presumption, from his not affixing his signature in the blank spaces left for that purpose, would be, that he never saw them, or, if he did, was unwilling to sign them. Whether his signature to the copies recorded in the minutes is sufficient evidence of the presentation of the originals, and a sufficient approval of them, it is not necessary now to decide.

If the clerk had followed the directions of the charter in presenting the resolutions, and the presentation had appeared by his official report, filed and recorded in the minutes, then the facts of presentation could always be shown by certain evidence; if approved, the approval would appear on the resolution itself, as is the case with the acts of our legislature, if not returned within five days with objections, thus taking effect the same as if signed, that fact would appear by written and certain evidence. These facts could all be readily certified in making

return to a *certiorari*, or readily proved whenever it might become necessary for any purpose to offer a resolution in evidence. My conclusion is, that in the case of the north sewer, there is no sufficient evidence that any of the resolutions were ever presented to the mayor for approval, or approved of by him, in the manner required by the charter, and that therefore the assessments are not binding upon the prosecutors.

In the case of the south sewer, the result to the prosecutors is the same, even admitting that the resolution of June 14th, 1853, and the one of June 2d, 1854, were regularly presented and approved. There is no sufficient evidence that the resolution appointing the commissioners, and the one confirming their report and assessment, were presented or approved, and without that the assessment cannot be sustained.

*Second.* The prosecutors had no notice of these proceedings, except notice to pay their assessments, no opportunity to be heard before the commissioners as to the propriety of being assessed at all, or as to the amount of assessment, nor of being heard before the council, or any other appellate tribunal, in opposition to or review of the assessments, the reports of assessments having been confirmed by the council at the same meeting they were presented. This is contrary to all our ideas of natural justice, and contrary to the well settled legal principle, that "whenever a court, or any person acting under legal authority, is to act judicially, or to exercise a discretion in a matter affecting the rights of another, the party thus to be affected is to have reasonable notice of the time and place when and where such act is to be done to the end that he may be heard in defence, or for the protection of those rights." This is the language of Ch. Just. Hornblower, in delivering the opinion of the court in *The New Jersey Turnpike Co.* v. *Hall el al.*, 2 *Harr.* 337. He says that no principle or rule of action is better settled at the com-

mon law than this, and he is fully sustained by the following, among other cases that might be cited. *Hess et al.* v. *Cole*, 3 *Zab.* 116; *Coster et al.* v. *New Jersey Railroad Co.*, 3 *Zab.* 227; *Vail* v. *Morris and Essex Railroad Co.*, 1 *Zab.* 191; *Youngs* v. *Overseers, &c.*, 2 *Green* 517; *Matter of Flatbush avenue*, 1 *Barb.* 286; *Jordan* v. *Hyatt et al.*, 3 *Barb.* 275; *Owners, &c.*, v. *Mayor, &c., of Albany*, 15 *Wend.* 374; *Vantilburgh* v. *Shann et al.*, decided by Court of Errors, June term, 1853, 4 *Zab.; The State (Munn, prosecutor,)* v. *Jersey City*, already cited.

These authorities refer to many others which need not be cited here. This very question was decided in 1 *Barb.* 286, and 3 *Barb.* 275, and the case in 1 *Barb.* is relied on in 3 *Zab.* 116.

That the charter did not direct what notice should be given, nor in fact require any, nor provide any appellate tribunal, nor any mode of being heard before the assessments were confirmed, does not vary the question, as will appear from the cases cited.

It may be well for the city authorities to consider whether they will not require additional legislation to enable them to meet objections of this character; what is said in 1 *Barb.* 290–91 is very pertinent to this part of the case.

That the assessment was a proceeding of a judicial character, so as to entitle the parties to notice, will abundantly appear, as well from some of the cases cited on this point, as from those cited above, on the question of the power of the court to interfere by *certiorari;* and, according to the decision in 2 *Harr.* 337, notice would be necessary in this case, even if not of a judicial character.

There are some other objections, which, though not discussed on the argument, are apparent on the face of the proceedings, and it may be well to mention them, that they may be avoided in future assessments.

The commissioners were required, in making the as-

sessment, to proceed according to the directions of the 34th section of the original charter, passed February 29th, 1836. This required the assessment for benefits to be made upon the owners " in proportion, as nearly as may be, to the advantage each shall be deemed to acquire." It nowhere appears, by the report of the commissioners, that they thus assessed each owner in proportion, as nearly as might be, to the advantage he might be deemed to have acquired. They report that an assessment was made upon the owners benefited, but not in what proportion; and, for anything that appears to the contrary, there may have been great inequality and injustice in the assessment; some may have been assessed for only half their benefits, and some for double. If this defect could be supplied by evidence, it has not been done; and as it does not appear that this important requirement of the charter was complied with, the assessments, for this reason, cannot, upon well settled principles, be sustained. See *The State (Durant, prosecutor,)* v. *Jersey City.*

Again, the 9th section of the act of February 28, 1849, which authorizes the construction of sewers, and by virtue of which these proceedings were had, requires the commissioners to be appointed in the same manner, and to act under like restrictions and provisions as the commissioners appointed under the 34th section of the charter, in the case of opening streets, in which case they must be " disinterested freeholders of the said city." In the case of *The State (Durant, prosecutor,)* v. *Jersey City*, it is decided that it must appear on the face of the proceedings that the commissioners possessed these qualifications. This fact appears in both these cases as to the commissioners originally appointed, but does not appear as to the substituted commissioners in the case of the north sewer; it was quite as necessary to appear in the one case as in the other, and therefore, upon the authority of the case just

cited, this omission would vitiate the assessment for the north sewer.

For these reasons, I am of opinion that the assessments upon the prosecutors in those cases should be set aside.

In the case of *Tims et al., prosecutors,* the following opinion was delivered by

VREDENBURGH, J. This writ is prosecuted by a number of land owners, to set aside assessments made against them for the expenses of building what has been called the south sewer in the city of Newark.

The defendants return, that, on the 6th August, 1852, a resolution passed their common council that the sewer should be built, and that, in pursuance thereof, it was built, at an expense of $60,415.15. They also return, that, on the 1st day of December, 1854, a further resolution passed the common council, appointing five commissioners to make an assessment of such expense, either in whole or in part, on the owners of property benefited thereby, and that if, by the judgment of the said commissioners, a part only of such amount should be assessed upon such owners, then to assess the balance of the whole amount upon the city; and that they should proceed in said assessment in the manner provided by the 9th section of the supplement to their charter, approved 28th of February, 1849; that the commissioners having, on the 6th July, 1855, reported that they had assessed $44,364 thereof upon the owners, among whom are the prosecutors, specifying how much to each, and the balance, $20,-947.66 upon the city, the said council, on the same day, ratified and confirmed it, and ordered the treasurer to collect the money according to the acts of incorporation. The first reason assigned for setting aside the assessments which we shall consider is, that none of these resolutions were presented to the mayor or submitted to his official action.

By the 22d section of the act of March, 1851, it is enacted, that every resolution of the common council of said city shall be presented to the mayor, by their clerk, on the next day; and, if he approve it, he shall sign the same, and if not, he shall return it with his objections, to be filed with the clerk within five days; and the council may at its next meeting proceed to reconsider the same, and if a majority shall then agree to pass the same, it shall take effect, and if not returned within five days as aforesaid, it shall take effect in like manner as if he had signed it. Under this section, a resolution cannot take effect upon its passing merely the common council; something more must be first done. It must first be presented to the mayor, and after that, and not before, it may take effect upon the happening of three events—1st, his signing it; 2d, his not returning it within five days; 3d, his returning within five days with his objections, and then its second passage through the council. The return shows none of these things; it merely shows the passage of these resolutions through the common council, and there stops. It fails to show any presentation to the mayor, any submission to his action, any action by him thereon. The return stating no more, we cannot presume that more was done; we cannot presume, from the mere statement, that it passed the council, that it was ever presented to the mayor, or was acted on by him; we can only take it to mean what it says, that it passed the council.

The language of this section, so far as regards the question before us, is identical with that in our federal and state constitutions, in the constitutions of most of the states, and in the organic laws of many of our large municipal corporations. The nature of the power conferred by this provision in fundamental law was well understood long before the passage of this charter; we are to presume the legislature used this language here in the same sense which universal practice had demonstrated its meaning

to be in other similar instruments. This section gives the mayor a qualified veto; it makes him a distinct and separate branch of the legislative power, as much so as the president of the United States is in the general, or the governors in the state sovereignties.

The terms are used in the same sense in all these instruments, and are intended to effect the same objects, this in a more narrow, those in a wider circle. An act of congress is no law at all, until it has passed the constitutional action of the president, as well as of the two houses; an act of the legislature is no law at all, until it has been submitted in constitutional form to the action of the governor; a resolution of the common council of the city of Newark can have no vitality until the legislative power of the mayor, as a separate and distinct branch, has been invoked upon it under the forms required by the charter.

These assessments were made without notice, and against their will, upon the prosecutors for a public improvement, are liens, if valid, upon their property, and may be collected by execution and sale. It is sought to justify them under the taxing power of the legislature. Conceding the power, conceding the right to delegate it for municipal objects to the defendants, yet to justify this local tax they must show a valid local law. Of a law this return shows only the iniatory steps, its passage through one only of two branches of the municipal legislature. It shows only void proceedings, an attempt to assess and raise a tax without a law.

If this had been a matter of merely formal error upon the record; if these resolutions had ever proceeded any further than it is there stated; if they had ever in fact been presented to the mayor, or received his official action, no doubt it would have been corrected, and the whole thing appeared upon the face of the return. But upon looking into the evidence, it is apparent that the return goes as far as the facts will warrant.

It thence appears that at the foot of the minutes of the respective meetings of the council, when these resolutions were passed, is a writing, of which the following is a copy: "I approve the resolutions passed by the common council, at its last foregoing meetings as aforesaid.—August 10th, 1852." But that none of them are signed by the mayor, nor any proof that they are in his handwriting, or were ever seen by him.

The evidence further shows that there is no further written evidence of his approval; that neither the mayor nor the council considered it important that he should sign the proceedings; that if a veto was not left with the clerk in five days the proceedings were understood to be approved; that the mayors had a chair in the council appropriated to their use, and were in the habit of regularly attending the meetings of council, and of going to the clerk's desk during their sessions, and examining such resolutions as they had any doubt of approving, and, in case of a veto, leaving it with the clerk, and that they, although probably aware of these proceedings, never sent in any veto; that the mayors were in the habit of going to the clerk's office the next morning, where they could have seen the minutes if they wished, and that the clerk was never in the habit of presenting the resolutions of the council to the mayors, except as above stated. This embraces all the evidence upon this point.

It has not been contended by the defence that the resolutions can be valid, or that the mayor can act on them before or without a presentation; but if it is insisted that the above facts are or amount to one, I think not, either in form or in substance.

The force of the terms used, with their context, the long, unbroken, universal understanding and practice under them in other similar instruments, every principle of public safety and convenience, every theory upon which this veto power is conferred, demand of us to consider the

section we have quoted to mean exactly what it says— to require a strict, literal, formal presentation, an actual affirmative tendering by the clerk to the mayor of the original resolutions; that there can be no constructive presentation, no waiver of the form. The term presentation, standing by itself, means according to general usage, nothing less. The action prescribed to the mayor after presentation is consistent with nothing less, he cannot veto, or return, or retain any resolutions but those presented by the clerk; the council can only again act on those returned.

This term, as we have before remarked, had been used in organic laws long before the passage of this charter. It had received a definite technical meaning, and the practice in regard to it had been uniform and universal. If an act has passed the house of representatives, how does the senate get possession of it, except only by a formal presentation under the orders of the house? If it passes both houses, the president entertains the matter only under a literal presentation. Whoever heard of any president, any governor, any branch of any legislature of any state, acting upon any law originating in any other branch, except upon a literal presentation. We must presume the legislature used the terms of this section in the same sense here. What is presentation of an act of congress to the president, of an act of the legislature to the governor, is presentation of a resolution of the common council of the city of Newark to the mayor.

The nature of the act to be done and the power conferred requires this literal presentation. This provision gives a qualified veto; but it is not the theory of this constitutional form, that the president, the governor, the mayor, is to stand at the doors of the legislative halls to watch their proceedings, and to whatever they dislike cry out veto, or to go into their archives, whenever they may find access, and sign or veto anything that may happen

to be there. The power cannot be called into action while the law is still under the control of one of the other branches of the legislature. The formal act of presentation is the mode, and the only constitutional mode recognised by which the law passes from the one legislative branch to the other, and by which, in this case, the council gets dispossessed, and the mayor possessed of the question. Until the mayor has thus entire control over the original resolution, by a formal surrender to him by the common council in the mode prescribed by the organic law, he can exercise no legislative power over it. He cannot take the initiative; he cannot originate a law; he cannot volunteer; he must wait the action of another. The formal surrender, by presentation to him by the council of the original resolutions through their clerk, is a condition precedent to the exercise of the power. Then, and not till then, and in this way, and not otherwise, does his jurisdiction over the subject matter attach; then, and not till then, is he dealing with the veto power under his official oath.

The necessities of the case require a literal presentation. This secures, and was intended to secure always record and certain evidence of the legal action of the veto power. Under its universal and careful practice, I am not aware that any litigated question has before risen in our courts. This case is itself a striking illustration of the unfortunate effects of a first departure, and of a dispute whether, in point of fact, a law has or has not passed all the branches of the legislature.

Adopt any other mode of presentation but a literal one, adopt the kind contended for here, and the great question will soon be, not what are the meaning of our laws, but whether we have any laws at all. Any degeneracy in practice from the strict compliance with the literal meaning of the terms used in these provisions would be fraught with great public mischief and inconvenience.

The evidence whether a law has received the sanction of all the legislative departments, resting upon facts of doubtful import and upon vague failing memories, would soon become unreliable, and the same question we have now before us raised upon every law.

Again, the section we have quoted says, every resolution shall be presented to the mayor by the clerk; if he approve, he shall sign the same, and if not, return it with his objections. Return what? Not what he has gone into the office, and voluntarily signed, but the resolutions presented by the clerk. Again, the council may then, at its next meeting, proceed to reconsider the same. Reconsider what? Only the resolutions presented and returned. The council can only then pass the resolutions presented and returned; and if not returned within five days, the resolutions shall take effect. How can these terms be complied with, either according to their literal or usual acceptation, without an actual presentation by the clerk?

The defendants insist, however, that the evidence shows a legal presentation. They do not pretend that there is any record or written evidence of it, or any order of council to that effect: on the contrary, the clerk testifies that it was not his habit to present; that neither he nor the mayor, nor the council, nor anybody else, thought it necessary. The record and the evidence shows affirmatively the want of all actual literal presentation.

But it is insisted that the blank approvals at the bottom of the minutes of the council are evidence of a virtual presentation.

Where the mayor has signed the original resolutions, the presentation may be inferred from his signature. But, unfortunately, these blank approvals are, in the first place, not signed, and, in the second place, they are not appended to the original resolutions, but to the minutes of council.

The clerk, moreover, testifies substantially that he never

presented even these minutes.     Even, therefore, if the
mayor had signed these blank approvals it would have
amounted to nothing.     It would have been upon his own
motion ; it would have been no approval of things pre-
sented ; it would not have been an official act as mayor, but
only as a private individual, and given no vitality to the
law.    The citizens of Newark have twice procured a change
in their charter, for the purpose of securing to themselves
the advantage of the exercise upon all the ordinances, re-
solutions, and by-laws passed by the council, of this veto
discretion under official oath.    They are entitled to have it,
and no law is binding upon them otherwise.    But they are
entirely deprived of it by this mode of proceeding ; for it
is the presentation only, as we have seen, by the clerk to
him of the resolutions that puts the mayor under his oath
of office, and until that is done he is but as a juror unsworn,
a judge out of court, a legislator in the streets.

But, unfortunately, here the mayor has not even signed
the minutes of any of the resolutions vital to these assess-
ments.     How these blank approvals not signed by the
mayor, written by we know not whom, no evidence that he
saw or read them, amounts to any proof of approval, is
more than I can see.    As he has signed others, and not
these, it would appear to prove the very reverse.    But it is
contended that the mayor's habit of coming to the clerk's
office the next morning, where he could have examined the
books if he thought proper, and his habit of attending the
meetings of council, and there examining such resolutions
as he had any doubt of approving, is evidence of presen-
tation.

In the first place, this is only evidence of a habit, and
entirely too loose to prove his presence, or his knowledge of
these particular resolutions.

With respect to his visits to the clerk's office next
morning, it is proved that his habit was to examine the

minutes of only such proceedings as had passed after he had left the council chamber, and these unsigned approvals show that he never did in fact the next morning even examine, much less approve these minutes. Besides, the clerk testifies he did not present these minutes as and for the original resolutions. If he had, it would not have been a legal presentation, for the charter does not authorize the clerk to present the minutes. He had no authority so to present them as that the mayor could retain them five days, and return them with objections.

It may be said to have been a mere matter of form for the clerk to have them made a formal presentation, a very easy thing to do, and if he had thought it necessary, would have done it. But the difficulty is, the express language of the statute only gives the mayor the power to veto what the clerk so presents, and if the clerk fails actually so to do, the whole power fails to be exercised.

It is next insisted, that the mayor, having a chair in the council, and a habit of regularly attending their meetings, and of going to the clerk's desk during their passage, and examining such original resolutions as he had any doubt of approving, amounts, in substance if not in form, to a legal presentation.

But this only raises a probability of the mayor's even knowing of their passage. In the next place, it appearing that he was individually favorable to them, and that he examined only those he had any doubt of approving, shows that he most likely never looked into these particular resolutions. But suppose all this to be so; that he was in fact present during the passage of these resolutions, and went to the clerk's desk, examined them, and had no objections, and therefore sent in no veto; so far from all this being a substantial execution of this constitutional provision, it appears to me to be the very reverse.

In the first place, it is not during their passage that they could be, as the law requires them to be, presented. This

must be done the next day. In the next place by the orig-
nal charter of 1836, the mayor was an integral part of the
common council, and had only an individual vote in their
proceedings. But it was soon discovered by the citizens of
Newark, as well as by many other communities, that a leg-
islature with only one branch was an unfortunate arrange-
ment. The very next year a change was procured, sepa-
rating it into two branches, *viz.*, the mayor and the coun-
cil, and giving the former a veto over the ordinances and
by-laws of the latter. So important was this organic change
considered, that, in 1851, this power was extended over
every resolution, as it had before been over the ordinances
and by-laws. The very and only object of these changes
was to take the mayor out of the council, and constitute
him a separate and independent department of the legis-
lative power; yet, notwithstanding these repeated enact-
ments, we find him still retaining his seat there, and legis-
lation going on practically as before, the difference being
that before these alterations laws were passed by the coun-
cil, with the mayor's vote as one of their body, afterwards
without his vote at all.

The mayor's habitual official attendance in the council
was irreconcilable with the meaning of these organic
changes; they contemplate his absence, not his presence;
a separate, not a joint action. Although a veto was given,
it was intended to leave the popular branch entirely free
to act, without being in the slightest degree influenced
by a sense this power gave him over their proceedings.
What would be thought if the president of the United
States should regularly take his seat in the house of rep-
resentatives, going to the clerk's desk to examine such
laws as he does not approve; reminding them, by his
official presence, of his ability to defeat their measures,
thus ever holding over their heads the rod of the veto
power? His presence, too, is not consistent with this con-
stitutional form, as regards the discharge of his own func-

tions.   The theory is, that the people choose for president, governor, or mayor, the best and wisest man in their respective communities, and clothe him with this negative upon legislative action.   Some of the objects of this are obvious : the law had already received the advantage of the local knowledge and patriotism of the more numerous branch ; but that branch is liable to sudden impulses, to be hurried along by blind party or other passions ; yet the laws they pass often affect the vital interest of the whole community, penetrating, with their consequences, far into the future, and casting their lights or shadows over wide fields of human destiny.   They have already had all the advantages to be desired from numbers : one object of these constitutional provisions, is to submit them before they go into effect to the calm and separate deliberation and responsibility of a single mind.   What was wanted was not one man additional, but one man alone ; that the law before it took effect should pass the ordeal of the closet, as well as of the public assembly.   It was purposely intended to insulate the president, the governor, and the mayor, so that he should not catch the popular contagion of the passing hour.   But upon formal presentation of the original law by the other departments of the legislature with full control over the document in private, in a different atmosphere, from a more elevated point of view, reflect upon the provisions of each particular law.

But it may be said, that as the mayor knew about these resolutions, and did not veto, he must be deemed to have waived a formal presentation.   This is not, however, a matter which admits of waiver : it is not a mere matter of convenience between the president and congress, or between the mayor and the council, which may be waived by agreement, but a question whether a particular law has passed all the branches of the legislature.   As well might it be said that the senate of the United States could waive a

formal passage through their body by individual agreement out of doors.

The whole sum of the argument is, that inasmuch as it is probable that the mayor was present at the passage of these resolutions, knew of their passage, and yet did not veto them, they must be deemed to have taken effect. If this be so, the charter might much better have been left as it originally was. There would have been no uncertainty; now we would have all the uncertainty without any advantage; the veto power would be frittered away; the president, the governor, the mayor, when called to respond for oppressive legislation, could truly answer, there has been no presentation; I am not responsible. Neither branch of the legislature need part with the control over the laws they pass; they could consider them law or not law, as they might deem fit. With their very existence depending upon such loose evidence of such indecisive facts resting only in memory, who could ever tell what has been enacted into law and what has not?

The framers of this charter, no more than those of the constitution of the United States, intended that whether this veto power had been exercised or not should be matter of guess work, to be done in the streets or in the lobbies of the house, a matter of accident, of thoughtless conversation unofficially, but upon a literal presentation of the original document by one branch of the legislature to the other, calling the attention of the executive formally to official duty.

The return showing the passage of these resolutions only through the council, and the evidence showing they were not presented to the mayor, I am of opinion that the resolutions appointing the commissioners, the report of the commissioners, and the ratification of them by the council, are without authority of law, and, as against these prosecutors, must be set aside.

Another reason assigned for setting aside these proceedings is also, in my opinion, well founded, *viz.*, that no

notice of any of them was given to the prosecutors; that in effect the first notice was the execution. It is admitted that the act does not in its terms require notice, that none was in fact given, and that the prosecutors have not appeared in any stage of the proceedings, except here, either in person or by counsel.

It is contended that this proceeding is an exercise of the taxing power under the authority of the legislature, that the act does not require notice, and that consequently none is necessary. Conceding this, it does not follow that the legislature can tax arbitrarily, and without giving an opportunity of being heard. The practice is the other way; all our tax laws require notice, and provide a tribunal to hear and determine. But this is not the precise question before us. Here the legislature have constituted a special tribunal, the common council and the commissioners. So far as relates to the passage of the resolutions authorizing the construction of the sewer, they act in their legislative capacity; but so far as regards how much of the expense is to be borne by the city, and how much by individuals, and how much each owner is to bear, they act judicially.

It is true the act does not require notice of any of these proceedings, but the law presumes that, so far as their proceedings are in their nature judicial, the legislature intended it. That the legislature would not organize a special judicial tribunal to ascertain if any and how much of the property of individuals should be taken for a public improvement, and require them to proceed to condemnation without hearing the persons to be affected, the presumption would be, in the absence of all directions in the statute, that the legislature intended that the tribunal should require reasonable notice.

It is a well settled principle, and laying at the foundation of the administration of justice, that no one is to be condemned in person or estate without an opportunity of presenting his case, and that, too, under a statutory proceeding which is silent upon the question of notice. 2

*Harr.* 339, *New Jersey Turnpike* v. *Hall* ; 2 *Green* 520, *Youngs* v. *Overseers of Hardiston* ; 14 *Mass.* 222, *Chase* v. *Hathaway*; 15 *Johns. R.* 538, *Kinderhook* v. *Claw*; 8 *Vermont* 389, *Corliss* v. *Corliss*; 6 *Johns. R.*281, *Rathbun* v. *Miller*; 15 *Wend.* 374, *Owners* v. *Mayor of Albany.*

It is urged, by the defendants, that these proceedings are legislative, and not a subject of review upon *certiorari*. But we have said already that this is so only as regards the resolutions ordering the sewer to be built, but as regards the assesments and the confirmation of the report they are judicial. *The People* v. *The Mayor of Brooklyn*, 9 *Barb.* 542, and cases there cited ; *The People* v. *Mayor of New York*, 5 *Barb.* 45.

I am also of opinion that the assessments are fatally defective in not showing, as the 34th section of the charter requires, that they assessed the owners, as near as may be, in proportion to the benefit received by each. These views make it unnecessary to consider the other objections raised against these proceedings.

Let the resolutions appointing the commissioners, the report of the commissioners, and the confirmation of the report, be set aside, as against these prosecutors.

The proceedings in the case of the north sewer are liable to the same objections, and to the same extent are set aside.

CITED in *Mor. Can. & Bank'g Co.* v. *Jersey City*, 1 *Beas.* 257 ; *City of Camden* v. *Mulford*, 2 *Dutch.* 57 ; *Martin* v. *Carron*, 2 *Dutch.* 231 ; *State* v. *Jersey City*, 2 *Dutch.* 445 ; *State* v. *Hudson City*, 5 *Dutch.* 116 ; *State* v. *Council of Newark*, 1 *Vr.* 306 ; *State* v. *Town of Bergen*, 1 *Vr.* 309 ; *State* v. *Mayor &c. of Orange*, 3 *Vr.* 54, 55 ; *State* v. *Town of Union*, 3 *Vr.* 345 ; *State* v. *Jersey City*, 5 *Vr.* 303 ; *State* v. *Morristown*, 5 *Vr.* 451 ; *State* v. *Jersey City*, 6 *Vr.* 380 ; *State* v. *May. of Bayonne*, 6 *Vr.* 479 ; *State* v. *Mayor &c. of Newark*. 7. *Vr.* 172 ; *State* v. *Village of Passaic*, 7 *Vr.* 387 ; *State* v. *Crane, Col. &c.*, 7 *Vr.* 307 ; *State* v. *Inhbts. of Trenton*. 7 *Vr.* 501. 504 ; *State* v. *City of Plainfield*, 9 *Vr.* 97 ; *State* v. *City of Passaic*, 9 *Vr.* 172 ; *Haight* v. *Love*, 10 *Vr.* 20